ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeal of -- | ) | |
| | ) | |
| Chloeta Fire, LLC | ) | ASBCA No. 59211 |
| | ) | |
| Under Contract No. W9128F-11-M-E023 | ) | |

APPEARANCE FOR THE APPELLANT:    Mr. Mark D. Masters
                                 Chief Executive Officer

APPEARANCES FOR THE GOVERNMENT:    Thomas H. Gourlay, Jr., Esq.
                                   Engineer Chief Trial Attorney
                                   Melissa M. Head, Esq.
                                   Engineer Trial Attorney
                                   U.S. Army Engineer District, Omaha

OPINION BY ADMINISTRATIVE JUDGE THRASHER

This appeal arises out of a contract to perform a prescribed burn on approximately 650 acres of federal land at Fort Randall, South Dakota. The government does not believe the contractor, Chloeta Fire, LLC (Chloeta), completed the prescribed burn on all the acres required and refused to remit Chloeta the full contract price. Chloeta asserts it did complete the contract and is entitled to the full contract price. The parties have chosen to proceed solely upon the record submitted,[1] pursuant to Board Rule 11. We have jurisdiction pursuant to the Contract Disputes Act of 1978 (CDA), 41 U.S.C. §§ 7101-7109. Only entitlement is before the Board for decision.

FINDINGS OF FACT

A.    *Background*

1. The U.S. Army Corps of Engineers (government or USACE) administers approximately 18,066 acres of federal land located on Fort Randall, South Dakota, through the USACE Fort Randall Project (project). The government awarded Contract No. W9128F-11-M-E023 (contract) to Chloeta on 23 September 2011 to provide a prescribed burn of vegetation on a specific track of approximately 650 acres of the project land. The initial period of performance was from 30 September 2011 to 30 September 2012. (R4, tab 4 at 1, 5) The original contract price was $52,888.30 (*id.* at 3).

---

[1] The submitted record consist solely of the Rule 4 file (tabs 1-7) and appellant's supplemental Rule 4 file (tabs 1-4).

2. The performance work statement (PWS) stated the objectives of the contract were:

> To effectively burn all vegetation on approximately 650 acres of federal land administered by the USACE Fort Randall Project. The purpose of the prescribed burn is to suppress and control invasive eastern red[ ]cedar, reduce the biomass of cedar piles that were cut and stacked in 2009, increase the abundance of native cool and warm season grasses and forbs, and to decrease the abundance of non-native species.

(R4, tab 4 at 5, ¶ 1.3)

3. The contract defined the scope of work in relevant part as follows: "The contractor shall complete the prescribed burn on approximately 650 acres of federal land administered by the USACE Fort Randall Project that complies with the standards in this PWS. Services include...2) a complete burn of all the vegetation and downed cedar piles located within the 650 acre unit." (R4, tab 4 at 5, ¶ 1.4)

4. The PWS described the specific tasks under the contract in pertinent part as:

> 5.1. Basic Services: The contractor shall provide prescribed burn services on approximately 650 acres of federal land administered by the USACE Fort Randall Project. Services include 1) the preparation of a burn plan that has been approved...,2) a complete burn of all the vegetation and downed cedar piles located within the 650 acre unit....
>
> ....
>
> 5.2.1. <u>Burn Plan and Prescribed Burn</u>: The contractor shall be required to write a burn plan[2] that has been approved...to completely burn all vegetation and downed cedar piles located within the 650 acre unit of federal land administered by the USACE Fort Randall Project.

(R4, tab 4 at 15)

---

[2] The burn plan was not included within the record.

5. Contract paragraph 1.6.10 describes the point of contact's (POC's) pertinent general duties as:

> The POC monitors all technical aspects of the contract and assists in contract administration. The POC is authorized to perform the following functions: assure that the contractor performs the technical requirements of the contract; perform inspections necessary in connection with contract performance; maintain written and oral communications with the contractor concerning technical aspects of the contract; issue written interpretations of technical requirements, including government drawings, designs, specifications; monitor contractor's performance and notifies both the KO and contractor of any deficiencies; coordinate availability of government furnished property; and provide site entry of contractor personnel.

(R4, tab 4 at 7) Paragraph 4.6.8 provides the POC with the responsibility to determine when the work has been satisfactorily completed and the authority to accept the work stating in pertinent part, "Payment will be made after satisfactory completion, inspection, and acceptance by the POC of all contract work performed" (R4, tab 4 at 15). Mr. Cody Wilson was the POC during performance (app. supp. R4, tab 1 at 2, ¶ 8)[3]

B.    *Contract Performance*

6. In March 2012, Chloeta personnel mobilized to the site to begin site preparation for the burn. Burning operations were halted due to an extreme drought. As a result, the contract was amended by Modification No. P00001 to extend the period of performance until 31 May 2013 (R4, tab 6). Chloeta submitted an invoice for services rendered to that point and was paid a partial payment of $19,000 to cover on-site preparations, travel, and planning. (App. supp. R4, tab 1 at 1, ¶ 5)

7. On 27 February 2013, the contract was further modified by Modification No. P00002 to make an equitable adjustment due to unavoidable weather delays. The price of the contract was increased by $21,801.11 to include costs for additional mobilization and demobilization, and other direct and indirect costs, increasing the total contract price to $74,689.41. (R4, tab 7; app. supp. R4, tab 1 at 1, ¶ 6)

---

[3] Ms. Dawn Rodriguez was appointed POC at award. The contract also stated that a letter would be issued identifying the POC's specific responsibilities and limitations. (R4, tab 4 at 7, ¶ 1.6.11) No such letter was included in the record.

8. Chloeta personnel performed a burn on 27 April 2013. Approximately 60-70% of Eastern Red Cedars on-site were consumed, and all Eastern Red Cedar piles were burned. (App. supp. R4, tabs 1, 2, 3, ¶ 7) Mr. Stanton, Chloeta's fire management officer, testified that:

> The evening of the burn I met with Cody Wilson in his office. Wilson told me that he expected a consumption rate of Eastern Red Cedar of approximately 30%. I asked Mr. Wilson if the burn had met his objectives and he said yes. He estimated a mortality rate of approximately 70% of the cedars, which I concurred with.

(App. supp. R4, tab 3 at 2, ¶ 8)

9. Mr. McAffrey, Chloeta's division chief, testified that the following day he accompanied Mr. Wilson as he conducted a final inspection of the project site during which Mr. Wilson told him that the project was complete and extremely successful. He also testified that he asked Mr. Wilson if Chloeta could demobilize from the work site, to which Mr. Wilson replied yes. (App. supp. R4, tab 2 at 2, ¶ 10)

10. On 5 May 2013, Chloeta submitted an invoice in the amount of $55,689.41. The government refused to pay the full amount, and instead calculated payment for $43,739.10.[4] On 9 May 2013, Chloeta resubmitted its invoice in the amount of $43,739.10, the total remaining balance according to the government, minus an earlier payment of $19,000. In May 2013, Chloeta was paid the $43,739.10. (R4, tab 2 at 3-4, ¶¶ 16-17, 19)

C.    *Chloeta's Claim*

11. On 3 June 2013, Chloeta submitted a claim for $11,950.31, asserting it completed the work under the contract and was entitled to payment of the remaining contract price (R4, tab 3). Chloeta argued that the deduction was improper because the government misinterpreted the requirements of the contract, asserting:

> First and foremost, the Schedule of Items does not afford the agency a per acre pricing strategy; a lump sum was to be paid for one (1) prescribed burn completion, which is what occurred. When referring to the Schedule of Items in this

---

[4] The invoices were not included in the record but the parties do not dispute these facts. However, the government's date for Chloeta's first invoice differs from Mr. Master's affidavit which states the invoice was submitted on 27 May 2013 (app. supp. R4, tab 1 at 2, ¶ 10). We do not find this discrepancy to be relevant in deciding this appeal.

4

contract, it is clear that payment was not intended to be based on a per acreage completion basis. Rather, the schedule indicates a quantity of one (1) prescribed burn with a unit of Lump Sum (not Acre) to be completed with an approved burn plan on approximately six hundred fifty (650) acres per the contract specifications.

(*Id.* at 1) Chloeta's claim also asserted Mr. Wilson had accepted the work, as follows:

> [A] final inspection of the project site occurred on the day after the prescribed burn was completed. Representing the Contractor at this meeting was Project Superintendent Brian Chad McAffrey and representing the Government as the [POC] listed in the contract was Cody Wilson, Natural Resources Manager. Mr. Wilson conveyed to McAffrey that the project was complete and extremely successful. Therefore, we were surprised when we received word from your office that the contract price would not be paid in full. Had we been aware that Mr. Wilson found the work unsatisfactory or unacceptable, we would have addressed Wilson's concerns immediately. Instead, our personnel demobilized from the work site back to Oklahoma on the understanding that the project was considered a complete success by the Government POC, Cody Wilson.

(*Id.* at 3)

12. The contracting officer (CO) issued a final decision (COFD) on 12 December 2013 denying Chloeta's claim in its entirety (R4, tab 2). The COFD explained the CO's interpretation of the contract requirements supporting her decision:

> The contract delineated that approximately 650 acres of land was to be burned by the Contractor. The contract further showed a map of the area to be burned. The Contractor, using its own discretion, did not burn over 100 acres of land as it was required to do under the Contract. The Contractor burned approximately 550 acres of land. The Contractor's decision to not burn these remaining 100 acres was due to weather conditions and other pending work for a different contract. Under the contract, the Contractor was charged with "determining burning conditions due to facts such as weather prior to mobilization to the site." ...The contract placed squarely on the Contractor responsibility to "inspect the sites

5

where services are to be performed to satisfy themselves as to all general and local conditions that may affect the cost of the performance of the contract." The Contractor did not burn over 100 acres indicated within the mapped region of this project to be burned. Therefore, the Government is not required to pay for services not rendered.

(R4, tab 2 at 5, ¶ 3) Responding to Chloeta's assertion that it completed the job and Mr. Wilson accepted the job, the COFD's finding of facts differed from those in Chloeta's claim, stating:

> In April 2013, the Contractor remobilized to the site, reestablished the necessary fire control lines, and developed an ignition plan that used topography to divide the area into two units. Ignition occurred on the main unit on April 26, 2013, with a successful completion by late that evening. The plan was for the Contractor to return on April 27, 2013, to burn the second unit. Corps employee, Cody Wilson, met with the Contractor on site the morning of April 27, 2013, after they conducted a reconnaissance on the second unit. It was the Contractor's opinion at that time that the second unit would not burn effectively due to the developing weather conditions that day. Mr. Wilson discussed with the Contractor's employee, Chad [McAffrey], the possibility of the Contractor returning to complete the burn or the potential of a price adjustment to reduce the contract proportionally for the unburned portion. Mr. [McAffrey] indicated that the Contractor had another burn to attend and that the Contractor would work through a fair price adjustment if they could not return within the contract period of performance.

(R4, tab 2 at 3, ¶ 14) To reinforce her argument, the COFD findings of fact also referenced an email from Mr. Wilson, stating:

> On May 9, 2013, Mr. Wilson sent you an email further explaining why the contract price was reduced due to the contract not being fully performed. In this email, Mr. Wilson stated:
>
> > As I stated before, I am very pleased with the results of the portion that was completed and applaud you on your top notch crew. If by chance you would like to take a run at completing the remaining portion, our

6

> burn window runs through May 31. However, I am
> assuming that will not be feasible for you and that we
> will need to mod the contract to let you out of the
> remaining requirement which we are willing to do.

> Mr. Wilson further relayed to the Contractor to submit
> a final invoice "anytime for the remaining $1,045.66."

(R4, tab 2 at 3, ¶ 18)

13. Chloeta appealed the COFD to the Board on 12 March 2014 asserting entitlement to $12,018.93. On 2 April 2015, the parties agreed to proceed solely upon the record submitted, pursuant to Board Rule 11.

14. Chloeta provided evidence in the form of sworn affidavits that industry practice in the prescribed fire community defines a complete burn as less than a 100% burn rate within the prescribed burn area. Mr. Masters' testified that "[i]t is unrealistic from my professional experience to expect that 100% of all fuel at a prescribed fire site will be consumed by the prescribed fire" (app. supp. R4, tab 1 at 2, ¶ 13). Mr. McAffrey's testimony echoed Mr. Master's, stating:

> In my experience, it is impossible to burn 100% of all
> vegetation at a prescribed burn site. In the prescribed fire
> community, a burn at a site with similar fuels as the Fort
> Randall Project site achieving 60-70% consumption of
> Eastern Red Cedar would be considered extremely successful
> and would be considered a "complete" burn.

(App. supp. R4, tab 2 at 1, ¶ 7) The government did not proffer any evidence to rebut this testimony. We find this testimony of these witnesses to be credible based upon the evidence of their professional experience in the prescribed burn community (app. supp. R4, tab 1 at 1, ¶ 3, tab 2 at 3-4).

15. Two Chloeta employees testified about their conversations with Mr. Wilson in support of Chloeta's contention that Mr. Wilson accepted the work and authorized Chloeta to demobilize (app. supp. R4, tabs 1-3). Mr. Stanton's sworn affidavit stated:

> The evening of the burn I met with Cody Wilson in his office.
> Wilson told me that he expected a consumption rate of Eastern
> Red Cedar of approximately 30%. I asked Mr. Wilson if the
> burn had met his objectives and he said yes. He estimated a
> mortality rate of approximately 70% of the cedars, which I
> concurred with. On the following day Mr. Wilson conducted

7

a final inspection and said that the project was successful and complete.

I was surprised to learn that the Government refused to pay Chloeta the entire contract price. At the completion of the project Mr. Wilson had said that the burn had achieved a higher consumption rate than anticipated and that the project was complete and highly successful. The day following the burn, Chloeta demobilized with Mr. Wilson's approval that the project had been completed to his satisfaction.

(App. supp. R4, tab 3 at 2, ¶¶ 8, 9)  Mr. McAffrey's sworn affidavit stated:

Only approximately 30% of the Eastern Red Cedar remained untreated. In a prescribed burn it is impractical to completely burn 100% of the vegetation on site. In my conversations on site with Cody Wilson, he recognized this fact and stated that he was only expecting about 30% of the Eastern Red Cedar to be consumed. We estimated that a total of 25 acres of the project area had not been burned due to snow cover on the north aspect. Cody Wilson told me that this unburned area should not be a problem in getting paid for the project, since this area would likely never burn. He did not request that we come back at a future time to attempt to burn this area.

A day later, I accompanied Cody Wilson as he conducted a final inspection of the Project site. Wilson told me that the project was complete and extremely successful. I asked if we could demobilize from the work site, and he said yes.

(App. supp. R4, tab 2 at 2, ¶¶ 9, 10)  The government did not submit any testimony or documentation to contradict Mr. McAffrey or Mr. Stanton's testimony on this issue. Additionally, the government did not indicate Mr. Wilson was unavailable to provide his account of his conversations and action on this issue.

## DECISION

Appellant argues the government misreads the contract language, interpreting the price to be measured on a per-acre or percentage basis of the burn (app. br. at 7). Instead, appellant asserts the contract language required it to "complete a burn of all vegetation and downed cedar piles within the unit," i.e., within the 650 acres, not a burn of all 650 acres. Since appellant safely conducted the burn by consuming all of the downed cedar piles and approximately 60-70% consumption of the standing cedar, which within the

prescribed burn community is considered a complete burn, appellant asserts it is entitled to the remaining balance of the contract price because it satisfactorily completed the contract. (App. br. at 6) In contrast, the government, argues that the contract language is unambiguous that appellant was required to complete a burn on all 650 acres identified. Consequently, since appellant admits it did not burn all the vegetation of the 650 acres (over a 100 acres), the government argues we should reject appellant's interpretation of the contract. (Gov't br. at 4-6)

Appellant readily admits it did not burn 30-40% of the standing Eastern Red Cedar on site. Despite this, appellant proposes two arguments why it completed the job and is entitled to payment of the full price.

First, appellant argues that:

> In the prescribed fire community, a burn at a site with similar fuels as the Fort Randall project achieving 60-70% consumption of the ERC would be considered extremely successful and would be considered a "complete" burn. CFI CEO Mark Masters has over 14 years' experience in prescribed burning. He testified that in his professional, expert opinion, it is unrealistic to expect that 100% of all fuel at a prescribed fire site would be consumed by the prescribed fire. Thus, when the overall ecological objectives are met or exceeded, as they were at this project, the contractor is entitled to full payment without deductions for fuel not consumed, as 100% consumption is not practically attainable.

(App. br. at 6) (Citations omitted)

Second, appellant argues that the government, the POC Mr. Wilson, accepted their performance when he told appellant the project was complete to the government's satisfaction and specifically approved appellant to demobilize its crew (app. br. 6-7). The government does not argue that Mr. Wilson lacked the requisite authority to accept appellant's performance but instead argues that appellant's version of the conversation between Mr. Wilson and appellant's employees never occurred; that Mr. Wilson never accepted the work under the project as complete or approved appellant's demobilization (gov't br. at 6).

Our findings establish Mr. Wilson was the POC and the contract delegated authority to the POC to determine if appellant had completed the job and to accept performance under the contract (finding 5). Thus, we conclude Mr. Wilson possessed authority under the contract to accept the work. *Henry Angelo & Co.*, ASBCA

9

No. 30502, 87-1 BCA ¶ 19,619. The government did not question his authority to accept the work only whether acceptance factually occurred.

Whether there was government acceptance is a question of fact and the burden of proof is on appellant to prove acceptance. *Hogan Construction, Inc.*, ASBCA No. 39014, 95-1 BCA ¶ 27,398 at 136,595 (citing *Henry Angelo & Co.*, 87-1 BCA ¶ 19,619). Appellant proffers two sworn affidavits from Chloeta employees testifying to their personal interaction with Mr. Wilson to prove acceptance (finding 15). We find this testimony credible and that appellant has met its burden of proof on this issue.

In rebuttal, the government relies solely upon two finding of fact in the COFD as evidence that Mr. Wilson did not accept appellant's work; one finding that recounts a conversation between Mr. Wilson and Chloeta employees on 27 April 2013 and a second finding quoting an email from Mr. Wilson to appellant on 9 May 2013 (finding 12). We have long held that COFD findings of fact have no presumptive evidentiary weight and are not binding on the parties or the Board. The parties have the burden of proving their case *de novo*. *Wilner v. United States*, 24 F.3d 1397, 1401 (Fed. Cir. 1994) (en banc) (findings of fact in a COFD are not binding upon the parties and are not entitled to any deference); *Precision Specialties, Inc.*, ASBCA No. 48717, 96-1 BCA ¶ 28,054 at 140,087 (a final decision retains no presumptive evidentiary weight nor is it binding on the Board); 41 U.S.C. § 7103(e). Thus, the burden of production has shifted to the government to rebut appellant's proof on this issue.

Mr. Wilson's testimony would be credible evidence of whether or not he accepted appellant's performance. However, the government did not submit any testimony from Mr. Wilson or anyone else. Instead, the government completely relies upon the findings of fact in the COFD. Further, the government did not indicate Mr. Wilson was unavailable to testify. Likewise, the government did not submit Mr. Wilson's email of 9 May 2013 as part of the record. The Board may, as we do in this instance, draw adverse inferences from a parties' failure to call witnesses whose testimony would otherwise be expected to be favorable to it. *Nobe General Construction*, ASBCA No. 51105, 00-2 BCA ¶ 31,099 at 153,595 (citing *Grunley-Walsh Construction Co.*, ASBCA No. 33004, 90-1 BCA ¶ 22,362 at 112,343); *Wilner Construction Co.*, ASBCA No. 32449, 88-2 BCA ¶ 20,614 at 104,174. Consequently, we conclude the government has failed to rebut appellant's evidence of government acceptance. We conclude Mr. Wilson possessed the authority to accept the work and did approve appellant's completion of the job and thus, accepted appellant's performance.[5]

---

[5] Given we conclude the government is bound by Mr. Wilson's acceptance of appellant's Performance, we need not address the parties' arguments regarding interpretation of the contract requirements.

## CONCLUSION

Appellant's appeal is sustained. The matter is remanded to the parties to negotiate quantum.

Dated: 9 November 2015

JOHN J. THRASHER
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 59211, Appeal of Chloeta Fire, LLC, rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

11